BERTHA BIGGS v. MODERN WOODMEN OF AMERICA, Appellant.—82 S. W. (2d) 898.

Division One, April 17, 1935.

*George G. Perrin, George H. McDonald, Nelson C. Pratt, W. E. Owen, David P. Janes* and *Arthur N. Adams* for appellant; *Goodwin Creason* of counsel.

*Vance Julian* for respondent.

HYDE, C.—This is an action on a $2,000 benefit certificate of the defendant by the widow of John W. Biggs, deceased, the beneficiary therein. After a trial resulting in a favorable jury verdict, judgment was entered for plaintiff in the sum of $1,912.55, being the full amount provided for by the certificate less eleven months' premiums thereon. Defendant appealed from this judgment to the Kansas

City Court of Appeals. ■ The judgment was affirmed in an opinion adopted by a majority of the judges of the Kansas City Court of Appeals, but upon the dissent of one of the judges, who thought the judgment ought to be reversed, the case was certified to this court. [Biggs v. Modern Woodmen (Mo. App.), 71 S. W. (2d) 783.] It is, therefore, before this court for complete determination the same as a case in which this court obtains jurisdiction by a direct appeal in the first instance. [See 6, Amendment, 1884 Constitution.]

The answer and reply are very fully analyzed in the opinion of the Court of Appeals, which may be referred to for further details. The defense was that the benefit certificate sued on was null and void because of Biggs' failure to pay prior to July 31, 1930, the assessment then due thereon, or any assessments thereafter. The reply admitted the nonpayment of these assessments but alleged waiver and estoppel which plaintiff claimed prevented a forfeiture. It was recognized by the Court of Appeals that "the contract of insurance consists of: (1) The application of John W. Biggs to become a member and obtain a benefit certificate; (2) the constitution and by-laws of the defendant society; (3) the benefit certificate. In the application, dated April 12, 1898, Biggs agreed: To pay all legally levied assessments and dues within the time provided, 'and to conform in all respects to the laws, rules and usages of the Society now in force, or which may hereafter be enacted and adopted by same;' he further agreed therein that the application and laws should form the sole basis of his admission to membership and of the benefit certificate to be issued; that his being suspended, expelled, or the voluntary severance of his connection with the society, should forfeit the rights of himself and beneficiary to all benefits and privileges therein or arising therefrom; that he fully understood the objects, organization, mode of government, and laws of the society, including the laws defining the qualifications for, and restrictions on, membership; that the laws of the society then in force, or thereafter enacted, enter into and become a part of every contract of indemnity between the members and the society, and govern all rights thereunder. He furthermore agreed that the answers, statements, and declarations in the application should form the basis of and consideration for the contract; that the whole should constitute one entire contract; and that if he should fail to comply with or conform to any and all laws of defendant, whether then in force or thereafter adopted, his benefit certificate should become void."

The benefit certificate issued to Biggs provided:

"His beneficiary or beneficiaries hereinafter named shall, in case of his death while a beneficial member of this society in good standing, be entitled to participate in the benefit fund of this society to the amount of two thousand dollars. . . . Provided, however, that all the conditions contained in this certificate, and the by-laws

of this society, as the same now exist, or may be hereafter modified or enacted, shall be fully complied with.''

The benefit certificate further provided:

''3. This certificate is issued in consideration of the warranties and agreements made by the person named in this certificate in his application . . . and his agreement to pay all assessments and dues that may be levied during the time he shall remain a member of this society.

''4. If payments assessed against the said member are not paid to the Clerk of the Camp of which he is or hereafter may be a member on or before the first day of the month following the date or the notice of levy of the same, then this certificate shall be null and void. . . .

''8. This certificate and contract is and shall be subject to forfeiture for any of the causes of forfeiture which are now prescribed in the by-laws of this society, or for any other cause or causes of forfeiture which may hereafter be prescribed by this society by amendment of said by-laws.''

Applicable provisions of the by-laws of the society were, as follows:

''Sec. 44. No Waiver of Any By-Laws.—No officer of this Society, nor any local Camp, or officer or member thereof, is authorized or permitted to waive any of the provisions of the By-Laws of this Society which relate to the contract between the member and the Society, whether the same be now in force or hereafter enacted. Neither shall any knowledge or information obtained by, nor notice to any local Camp or officer or member thereof, or by or to any other person, be held or construed to be knowledge of or notice to the Head Camp, or the officers thereof, until after said information or notice has been presented in writing to the Head Clerk of the Society.

''Sec. 57. Assessments.—For the purpose of creating the Benefit, fund out of which death, accident, and cash withdrawal benefits shall, subject to the other provisions of these By-Laws, be paid as assessment for each and every calendar month hereafter is hereby levied upon each and every Beneficial member of the Society, in good standing, heretofore or hereafter adopted, and said assessments shall be paid on or before the last day of the calendar month for which they are levied, to the Clerk of the Camp in which membership is held, without further notice than that contained in this section; and each and every Beneficial member, heretofore or hereafter adopted, shall be liable for, and shall pay, on or before the last day of each and every calendar month, and as a condition precedent to continuing in good standing, the amount per assessment to be determined by the tables of monthly assessment rates according to the By-Laws now in force or as hereafter amended and enacted. . . .

''Sec. 58. Special Assessments.—The Board of Directors may, from time to time, levy a special assessment or assessments whenever,

in its judgment, the condition of the Benefit fund requires same for the purpose of providing for and meeting the liability of the Society, or to comply with the law of any state in which the Society is authorized to transact business, and each and every Beneficial member of the Society shall be liable for, and shall pay same during the month for which levied. . . . .

"Sec. 61. Member When Suspended.—Every Beneficial member who shall fail to pay any regular or special assessment on or before the last day of the month within which same is payable, or who shall fail to pay local Camp dues therewith, including Per Capita tax, or who shall fail to pay with the assessment or assessments next thereafter payable, any fine imposed shall, *ipso facto*, become suspended, and during such suspension all Benefit certificates and riders of such member for which such payments are not made, shall be absolutely null and void."

Biggs was a member of the local camp of the society at Clinton. From the time Biggs' benefit certificate was issued up to 1904 his monthly assessment was ninety cents. From 1904 to 1919, it was $1.60. It was increased beginning July 1, 1919, to $2.90. In June, 1929, a meeting of the head camp of the order again increased assessments on benefit certificates and provided that this increase should go into effect July 1, 1930. It also provided for new forms of insurance, at a fixed rate with no further increase, which members were given the option to take in place of their old certificates which were thereafter subject to annual increases. The increase required Biggs, in order to keep his old certificate in force, to pay monthly commencing July 1, 1930, an assessment of $7.60 and local camp dues of thirty-five cents. This rate would be increased on July 1 of each year thereafter. The new level rate insurance would have cost Biggs $13 per month, and camp dues, without ever increasing. There was no question raised about the legality of this increase. Respondent's original brief in the Court of Appeals states: "We are not contesting the validity of the by-laws. Insured stated time and again that he was willing to pay whatever the Head Camp wanted on the old policy." Plaintiff's reply tendered the increased assessments and the judgment provided for deducting them. As stated in the opinion of the Court of Appeals: "Plaintiff's contention is not over these matters, but is based on her claim that defendant, through its special agent and representative sent to see Biggs, violated its contract with him by telling him defendant would no longer receive payments from him under the old benefit certificate; that it was of no value, and that he must exchange his certificate for a new one granting insurance under a different system and on greatly increased rates; and plaintiff's theory is that defendant, not only violated its contract and brought about the cessation of payments from Biggs until he should hear from the Head Camp (which never came), but

that it waived its right to declare a forfeiture of his rights under the certificate because of such nonpayment, and is estopped to make or enforce such a defense.'' Any question about the right of the society to collect an increased assessment upon benefit certificates from its older members has, therefore, dropped out of this case.

The society sent out special service representatives soon after June, 1929, to explain to members the changes made by the meeting of the head camp and the new forms of insurance provided. Before they went out, these representatives were given a special course of instruction under the supervision of the head camp. Clerks of all local camps were notified that these representatives would come. According to defendant's evidence ''these Special Representatives were instructed to give full information to each member upon whom they called, but in no case were they to inform any of such members that their exchange or transfer from the current cost plan was compulsory. . . . These representatives were instructed to call on members of the Society for the purpose of explaining in detail to each member the various options to which the member was entitled, and they were specially instructed to inform all members that they might either exchange their old certificates or carry their old certificates on the current cost or step-rate plan.'' The credentials carried by these special representatives stated, among other things:

''This will introduce to·you Neighbor — a Special Service Representative of the Society, who is calling on you to explain the action of the delegates at the June, 1929, Head Camp, held in Chicago, Illinois, and the way in which that action affects the Modern Woodmen protection of some members. This Representative will present our various exchange proposals and help select the one best fitted to each member's individual needs. He is fully authorized to do everything necessary in connection with the exchange, collect and receipt for payments, take up old certificates, and issue interim certificates therefor.''

These representatives received a commission of twenty-five per cent of the money they collected on new policies. Literature was sent from the head camp to local camp officers explaining the action of the head camp and the new insurance policies. Printed circulars were sent to them for distribution among the members. All these stated the option to keep the old certificates, but commented upon their increasing cost, and urged that they be exchanged. The society published a monthly paper which was sent to all members. It was shown that one of these papers was mailed monthly to Biggs and that the society was never notified by the Clinton postmaster that it had not been delivered, as he was instructed to do if that happened. This paper contained articles explaining the action of the head camp, the reasons therefor, and the optional forms of insurance available to members including the option to keep their old certificates on the

'"step rate" or annually increasing assessment plan. The opinion of the Supreme Court of Illinois (Jenkins v. Talbot, 338 Ill. 441, 170 N. E. 735, 80 A. L. R. 638) upholding the right of the order to make the changes and increase the rates was also published in this paper.

Mrs. Biggs testified that one of the society's special service representatives came to see Mr. Biggs in 1929 while it was still warm weather and that he made seven visits within about two months. Mrs. Biggs was the only witness as to the conversation between this representative and Mr. Biggs and she did not claim to have heard all that was said in all of their conversations. The time, when these representatives came to Clinton where Biggs resided, was fixed as September 1, 1929, by the clerk of the local camp, who was also plaintiff's witness. He also said they stayed about sixty days. According to Mrs. Biggs, the first time this agent came Biggs was not at home. The second time the agent came he told Biggs, in her presence, that he was there to see about changing his policy; that "he told him he would have to change his policy, take out a new one; that his old policy was no good;" that "he would have to take a raise—take out a new policy;" that "if he didn't change it that his old policy was no good, he would have to take out a new policy;" that "it wasn't worth the paper it was drawed on;" and that the head camp "wouldn't receive any premiums on the old policy. Mr. Biggs "told him he was going to keep his old policy and was willing to pay on the old policy; that he thought his old policy was good." The agent said "for Mr. Biggs to study it over and he would be back."

The third time the agent came he told Biggs "if he didn't change this policy it was no good; that he would have to change it, just like going into a new order, at his age." Mr. Biggs said "that he had been paying on it thirty-two years and that he thought it was good." The agent "asked him every time he came for the old policy." The fourth time the agent came "he wanted him to change his policy. Mr. Biggs told him, no, he was going to keep his old policy . . . he told him he was willing to pay the raise on the old policy." Then the agent "told him he would have to take out a new one." The agent came a fifth, sixth and seventh time and each time told Biggs "he would have to take out a new policy," but Biggs "told him he wouldn't give up his old policy."

On cross-examination Mrs. Biggs testified about these conversations further, as follows:

"Q. But when this man was there, Mr. Biggs told him he thought his old certificate was good, did he? A. He did. Q. He told him that every time he was there, didn't he? A. He did. Q. He told this man he was willing to pay for whatever the rate calls for on the old certificate? A. Yes, sir. . . . Q. You said that Mr. Biggs claimed that the policy was good and that the representative said

888

it wasn't? A. He claimed so. Q. And he continued to claim that every time the representative came, didn't he? A. Yes, sir. . . . Q. There was never anything definitely closed at any time, was there— even the last time he was there, didn't he say the matter would be left open? A. He told him to study about it. Q. Even the very last time he was there? A. Yes. . . . Q. You don't know what was said the last time he was there? A. No, I don't. Q. You don't know whether he told Mr. Biggs that he could continue on the current cost this last time, or not? A. Well, I don't think he did. . . . But I do know that the representative, he said, now you consider that; you will be sorry; . . . Q. You appeared on the scene? A. And he said, I want you to consider and let me know. . . . Q. This man who came there wanted Mr. Biggs to give it up didn't he? A. He did. Q. But he told him he wouldn't do it? A. He did. Q. He thought it was good? A. He sure did. . . . Q. You heard the statement that they wouldn't receive any more assessments in these conversations, didn't you? You heard that, didn't you? A. Yes, sir. Q. But you kept on meeting them just the same, didn't you? A. I kept on until the time was up. Q. What time was that? A. July, 1930. Q. He said the society couldn't accept any more assessments after he was there, didn't he? A. After 1930. Q. You never asked the clerk about that—Mr. Worman? A. No.''

The clerk of the local camp (called as a witness for plaintiff) to whom the monthly payments were made said that he had a conversation with Biggs after the agents had been there but before July 1, 1930; that ''he was troubled on it before he dropped out;'' and that Biggs said to him ''it looks like I am going to have to get out, awful heavy on me to carry this insurance; something to that effect; he said if they reaised it on him, he couldn't pay; that is about all that he said.'' The clerk further said that in 1930 the head camp sent notices to be sent out by him to all members who had kept their old certificates showing the amount of the old assessment rate thereon and the new rate, which would be due July 1st, and which explained both the new and the old forms of insurance; that he pinned these notices to the June, 1930, receipts of all members; and that he either handed them out when they paid or mailed them to them. He had no independent recollection of pinning one of these notices to the receipt given for Biggs' June payment but said he did not know why he should have missed them and that if he ''missed them, it is the first one.'' He said that he would have accepted the increased rate on Biggs' policy for July, 1930, if it had been tendered; that the by-laws required him to do so; that about thirty-five members did keep their old certificates in force by paying the increased current cost assessment; that many more either took new policies or allowed their old certificates to lapse; that neither Mr. nor Mrs. Biggs ever

came to consult with him "as to what they might do under their old policy," after the conversation with Biggs above stated; that he "left it with the man and the representatives, . . . thought it was the member's business to take care of his own policy;" and that he "never persuaded anybody to carry insurance."

On the back of the notice of the increased assessment for July 1, 1930, which the clerk said he gave to all members during the month of June the new level rate plan was explained and the option to keep the old certificates was stated, as follows:

"Members on this plan pay monthly rates of assessment that cover only the actual current cost of death claims occurring in their respective age groups. Such rate does not include any reserve to keep it from increasing yearly. As members advance in age, the current cost naturally increases because of the increase in the number of deaths, which determines the 'cost.' Thus, each year the monthly rates 'step up' or become greater in amounts. In other words, Current Cost insurance is yearly renewable Term insurance. As older ages are reached the rate naturally becomes very high to meet the current cost of deaths."

The articles which appeared in the monthly magazine of the order made similar statements. Biggs' July 1, 1930, assessment, which was the first increased assessment, was not paid and he was suspended for his failure to pay it. He never applied for reinstatement and died about a year thereafter. He never made any tender of any amount in July, 1930, or thereafter. Mrs. Biggs said that she paid Mr. Biggs' assessments to the clerk, including the last one, and that no statement of the July assessment was pinned to her last receipt. Defendant's contention is that its demurrer to the evidence, at the close of the whole case, should have been sustained.

■ Fraternal Benefit Associations are essentially different in many respects from insurance companies. [19 R. C. L. 1183-85, secs. 6-7.] They confine their operations to their own members. They do not solicit business from the general public. They have a representative form of government. They usually limit the class of persons, who may be designated as beneficiaries, to certain relatives of members. They do not operate for profit but accumulate a fund from contributions of members to be used in the aid or relief of members or their beneficiaries. "Fraternal insurance is temporary insurance—insurance from the maturity of one assessment to the maturity of another—and stipulations to insure promptitude in the payment of assessments constitute both the substance and the essence of contracts for it." [Modern Woodmen v. Tevis, 117 Fed. 369.] The members are, in effect, both insurers and insured. The rights of the members or their beneficiaries to participate in the fund are not fixed by the terms of the certificate, as in the case of an ordinary life insurance policy, but depend also upon the constitution and

by-laws of the association. Since they are self-governing bodies, regulations are made by the members themselves through their duly elected representatives and, therefore, there is good reason to regard them in a somewhat different light from conditions written in a policy of insurance by an ordinary insurance company dealing with the general public for profit. Every member, like every citizen of a free country, has the right to make his voice heard. Recognizing such differences, our Legislature has enacted a statute providing that such societies "shall be exempt from all provisions of the insurance laws of this State, not only in governmental relations with the State, but for every other purpose, and that no law hereinafter enacted shall apply to them unless they be expressly designated therein." [Sec. 5993, R. S. 1929.] It has also enacted a special article of the insurance laws by which such societies shall be governed. [Art. 13, Chap. 37, R. S. 1929.] Nevertheless, general principles of the law of insurance and of the law of contracts are to be considered in determining the rights of the members of such societies and their beneficiaries insofar as they are applicable and are not superseded by the special statutory provisions of the above article. They may, of course, be prevented from claiming a forfeiture of a member's policy under the law of waiver or estoppel. [45 C. J. 132, sec. 110; 10 R. C. L. 817, sec. 123.]

■ While waiver and estoppel are often spoken of without distinction in the law of insurance (45 C. J. 132, sec. 110), there is a difference which is well illustrated by the facts of this case. [See Thomas v. Modern Woodmen, 218 Mo. App. 10, 260 S. W. 552; State ex rel. Thomas v. Trimble, 303 Mo. 266, 259 S. W. 1052.] While a waiver may be either express or implied (67 C. J. 304, sec. 7), there must be to constitute a true waiver, either an actual intention to relinquish an existing right, benefit, or advantage with knowledge, either actual or constructive, of its existence, or there must be such conduct as to warrant an inference of such an intention to relinquish. [67 C. J. 299, sec. 3; State ex rel. Continental Life Ins. Co. v. Becker, 336 Mo. 59, 77 S. W. (2d) 100.] There may be and usually are some elements of estoppel in an implied waiver. However, either "the intention to waive must plainly appear, or else the acts and conduct relied upon as constituting waiver must involve some element of estoppel." [State ex rel. Continental Life Ins. Co. v. Becker, supra.] The situation here, however, is not one of waiver either express or implied. Whatever construction may be placed upon what was said, there is certainly nothing to show that the defendant, or anyone purporting to represent it, intended to waive payment of premiums and carry insurance for Biggs without the payment of his monthly assessments, nor did any one do or say anything which could lead him to think so. There was neither a stated relinquishment of this right nor any neglect in insisting upon it. Biggs was

promptly suspended and his certificate declared forfeited at the end of the very first month in which he was required to pay but failed to do so. Plaintiff must and does seek to reply upon estoppel: Namely, an estoppel against defendant to set up the defense of forfeiture, not because there is any question about defendant's right, under its by-laws, to forfeit Biggs' certificate when he stopped paying on it, but because defendant's special service representative, by false representations that Biggs' certificate was worthless and could not be continued in force by the payment of any amount, induced and caused Biggs to fail to pay his July, 1930, assessment, and that defendant was estopped from forfeiting his policy for a failure it brought about.

While waiver depends upon intention and does not necessarily "imply any conduct or dealing with another by which that other is induced to act or forbear to act to his disadvantage; . . . an estoppel necessarily presupposes some such conduct or dealing with another" [Thomas case, supra.] The basis of estoppel is "that a person is held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon." [10 R. C. L. 689, sec. 19.] In applying estoppel, "former cases 'must be looked to and applied by way of analogy rather than rule.' . . . 'While the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances.'" [State ex rel. Consolidated School Dist. No. 2 of Pike County v. Haid, 328 Mo. 739, 41 S. W. (2d) 806, l. c. 808.] The books are full of cases, where estoppel has been applied or denied in insurance cases, and, since the facts vary so materially, it would not be worth while to lengthen this opinion by attempting to discuss and distinguish them.

It is, of course, true that a company or society may be estopped from claiming a forfeiture, if by its conduct it has induced the failure, of the insured to do what was required of him, upon which the right to assert the forfeiture is based. [32 C. J. 1347, sec. 622; 45 C. J. 113, sec. 98, pp. 151-155, secs. 121-124.] "This is upon the equitable principle, enforced by the courts, that, if the company through those who are authorized to speak for it, either by words or conduct, has induced the assured to refrain from doing that which he otherwise would probably have done, in view of the conditions of the policy, then it will be estopped from asserting the forfeiture it has so induced, to the prejudice of the assured, who has given faith to such statements or reasonable inferences from such conduct."

[Frels v. Little Black Farmers' Mut. Ins. Co. (Wis.), 98 N. W. 522, and authorities cited.] A good example of such a case is Wuerfler v. Trustees of Grand Grove of Wisconsin Order of Druids (Wis.), 92 N. W. 433, where it was held that a society could not forfeit a certificate for nonpayment of dues, when it had notified the holder, during the month in which his payment was due, that his certificate would not be recognized as in force because of a change in its constitution entirely doing away with all existing contracts. Of course, an entire repudiation of the contract would be a good excuse for nonpayment and, if the repudiation was determined to be unwarranted, the society having induced the nonpayment could not then change front and forfeit the policy for the failure to pay which its action had brought about.

Is that the situation here? The majority opinion of the Court of Appeals considered that it was, saying: "The facts and circumstances as shown by the evidence in plaintiff's favor, if believed by the jury to be true, are sufficient to establish that defendant is estopped to declare a forfeiture of the benefit certificate sued on because of the nonpayment of the premium specified, and insured's beneficiary cannot be deprived of her insurance on account of her husband's failure to pay, which failure was brought about by the acts, misrepresentations, and conduct of defendant's authorized special agent. . . . The most vital matter, namely, the right to continue the old certificate at an increased rate, was not only omitted and ignored, but was denied altogether, and insured was told he must exchange his worthless old policy for a new one." On the other hand, the proposition is stated thus, in the dissenting opinion in the Court of Appeals: "The question in this case is as to whether or not misrepresentation by the special agents, to the effect *that a right that actually existed under the by-laws* did not exist, constitutes a waiver (estoppel?) of the right of the society to cancel a benefit certificate for nonpayment of assessments." The dissenting opinion holds: "That under the provisions of the contract in issue, the insured was conclusively presumed to know the law of his contract; that reliance by him on misrepresentations made by the representatives of the society, acting under the authority as set forth in the letter in evidence, did not absolve the insured from paying or making tender of assessments as provided by the by-laws of the society."

While we are forced to disagree with the holding of the majority opinion that there can be an estoppel in this case under all the circumstances disclosed by plaintiff's evidence, we do not think it is necessary to go so far as to hold that an insured is conclusively presumed to know the law of his contract, in the face of misrepresentations, at least under all circumstances (see Benes v. Supreme Lodge (Ill.), 14 L. R. A. (N. S.) 540, and note), or to say that the holder of a benefit certificate is not, as a matter of law, entitled under any

circumstances to rely upon such representations as plaintiff testified were made by defendant's special representative, or that the society could not be estopped by any representations of its agents unless it had notice thereof as required by Section 44 of its by-laws. It seems to us that, even if Biggs was entitled to rely upon these statements, plaintiff's own evidence shows that he did not do so. Instead, it shows that Biggs did not believe such representations and did not rely upon them. Even though we consider that any conversation that Mrs. Biggs did not hear was to the same effect as the strongest statements she said she heard and that the statements of the special representative were unequivocally that the old certificate would be worthless after July 1, 1930, and could not be continued by the payment of any amount, but that Biggs would have no insurance at all unless he gave it up and took out a new policy, which is certainly considering the evidence in the light most favorable to plaintiff, still there remain Biggs' statements, shown by the same testimony, that "he was going to keep his old policy;" that "he thought his old policy was good;" that "he wouldn't give up his old policy;" and that "he was willing to pay the raise on the old policy." Is it not significant that he said this on the fourth visit of the agent? How could he have been "willing *to pay the raise on his old policy*" if he did not then know there was a raise on it? He had sources of information other than this agent. He had access to the literature sent out by the society and to its monthly magazine. The local camp was required, by the by-laws of the society (in evidence and not disputed) to hold monthly meetings. Biggs was not an invalid confined to his home. He, no doubt, had good reason to believe that his certificate was good, even if the agent, to earn his commission, did attempt to "high pressure" him to change. Anyhow, we have plaintiff's own testimony that he did believe it.

It further appears from plaintiff's own testimony that Biggs not only "told this man he was willing to pay for whatever the rate calls for on the old certificate;" but that he continued to claim that his policy was good every time the representative came; and that, in the last conversation plaintiff heard, the matter was left open for Biggs "to study about it" and let him know. Biggs had, twice before, the assessments on his certificate raised, so that this was not an entirely new experience for him. It appears also that Biggs did study about it. The clerk of the local camp, who was plaintiff's witness, said that, after the agent left, Biggs "was troubled about it before he dropped out" and told him that "if they raised it on him he couldn't pay" and was "going to have to get out." Biggs' statements to the agent and to the clerk, together with the fact that the society sent out explanatory literature, published articles in its monthly magazine, sent out statements of the amount of the increase which all holders of old certificates were required to pay, and also

the discussion that such changes in rates must have evoked among the members of the local camp, would seem to show that Biggs must have known that there was an increased assessment provided for on his old certificate which would keep it in force, as well as new forms of insurance policies. There is certainly no direct positive testimony that he did not know it, but this conclusion must be based upon inferences, drawn from the testimony concerning the agent's statements, that he believed what the agent told him and did not find out anything else from any other source. From all of plaintiff's testimony and the surrounding circumstances, is the inference, that after the agent left Biggs thought his certificate was worthless, a reasonable inference? How can it be in the face of Biggs' own statements showing that he did not believe it? It would seem that the only reasonable inference would be the other way.

Moreover, while a statement, that the by-laws of the order had been changed would be a statement of an existing fact (that would have been the truth however), a statement as to the effect of the new by-laws would hardly be more than an expression of an opinion as to their meaning. Especially would a statement that a by-law would have a certain effect, at some future date and not at the time, be an expression of an opinion as to its meaning and effect. Biggs seems to have treated it as the agent's opinion and did not agree with it. Ordinarily "mere expressions of opinion by interested persons cannot, although subsequently shown to be groundless or false, be regarded as misrepresentations for the purpose of creating an estoppel; there must be a material misrepresentation of a fact." [21 C. J. 1142, sec. 143.] The same thing is true of a promise or prediction concerning the future. [21 C. J. 1192, sec. 144.] These principles were applied in Rechow v. Bankers Life Co., 335 Mo. 668, 683, 73 S. W. (2d) 794, where plaintiff, after a change in the organization of the company, wrote to inquire its effect upon his insurance. The company stated in answer to his letter, the following:

"The recent change in plan relates more especially to business to be written in the future rather than to the business now on the books. All contracts heretofore issued will be carried to maturity in accordance with their terms. The present members are not to be put in a class by themselves, but will remain part of a large and growing company and will share in the benefit derived from the admission of new business."

Later, after litigation concerning the matter, the company did change the classification of plaintiff so that he and other old members were placed in a separate class. This court considered the question of whether or not an assessment based upon this classification was legal and decided that it was. It then considered the further question "Was defendant nevertheless estopped from demanding it and treating the insurance as forfeited for plaintiff's refusal to pay it because

of the letter written to plaintiff December 1, 1911?" As to this matter the court said:

"But, treating the letter as calculated to be and being understood by plaintiff as a statement that level premium policyholders would be assessed or would pay proportionately with assessment members to meet death losses among the latter class it hardly amounts to more than a·promise of what would be done in the future or an expression of opinion relative to the meaning of plaintiff's contract as affected by the reorganization.".

Likewise, in Thomas v. Modern Woodmen, 218 Mo. App. 10, 260 S. W. 552, the insured was killed while working as an electric lineman. By the terms of his certificate, the company was not liable if a member was killed while engaged in that occupation. The plaintiff offered to prove that the insured had, at a session of the local camp, informed the district deputy head consul of the society that he had changed his occupation to that of an electric lineman and asked if his beneficiary would receive her insurance, if he were killed while so engaged, and was informed by him, in open lodge meeting, that the insurance would be paid unless the society expelled him for engaging in such an occupation. It was claimed that the insured continued to pay assessments in reliance upon this statement and that the society, having accepted them with full knowledge that the insured was engaged in a prohibited occupation, was estopped from denying liability on account thereof. The Court of Appeals, reviewing many authorities, decided against this contention. The case came to this court on certiorari. [State ex rel. Thomas v. Trimble, 303 Mo. 266, 259 S. W. 1052.] This court in its opinion stated that the holding of the Court of Appeals upon the issue of estoppel was: "That the statements made by the district deputy head consul in reply to the question propounded to him by the insured in open lodge was not a representation as to a past or existing fact, but merely the expression of an opinion, given in good faith, as to the legal effect of certain provisions of the contract of insurance, with which both he and the insured were entirely familiar, and that therefore such statement could not be made the basis of an estoppel."

This court held that:

"The rulings summarized in the preceding paragraphs are not in conflict with any decision of this court to which our attention has been called. We certainly have never held that a statement made by a general agent of an insurance company, to one of its policyholders, expressing an opinion as to the legal effect of the provisions of the latter's policy, was, absent fraud, binding on the company, either as an admission or on the ground of estoppel."

Conceding that there is some basis for an·inference of fraud or bad faith upon the part of the agent in this case, we must also con-

sider that if the representative's statements referred to a present condition of Biggs' certificate, then Biggs' subsequent action shows that he knew they were untrue, long before he forfeited his rights by failing to pay in July, 1930, because he paid monthly assessments thereon at least seven times after the agent's last visit; while, on the contrary, if these statements (although in form relating to the present) are to be construed to mean that his certificate would be worthless after July 1, 1930 (which is evidently plaintiff's theory), then they were representations about a future and not the present status of his certificate. Biggs had two-thirds of a year remaining to find out about this. He was a member of a society with a representative form of government. He knew that members could not have insurance without paying something for it and he knew that whatever changes had been made were made by the representatives of all the members in a duly convened national quadrennial meeting of the society. Even though Biggs may not be conclusively presumed to know what the new by-laws were (see Lloyd v. Modern Woodmen, 113 Mo. App. 19, 87 S. W. (2d) 530), regardless of the statements made by a representative of the head camp, still a member of such a society who is told that there is a change of the by-laws of his society, which will affect his rights only after almost a year's time, is certainly under some obligation to make some effort to find out something about the matter for himself when means of information are available to him. Reasonable diligence is required of one claiming an estoppel. [See 21 C. J. 1129, sec. 13, and cases cited.] This case is far different from the Wuerfler case, above referred to, where a member was told that his certificate had been repudiated at the very time when the payment was due, for the nonpayment of which, the society afterwards attempted to assert a forfeiture. We hold that, in view of the relationship of the parties, the sources of information available to Biggs, the time he had for investigation, and his expressed disbelief of the agent's statements, in the light of all the circumstances shown by plaintiff's evidence or conceded to be true, the facts did not warrant the submission of the question of estoppel to the jury. Insofar as Bellis v. Modern Woodmen (Mo. App.), 49 S. W. (2d) 1059, is in conflict with the views herein expressed it is overruled.

The judgment is reversed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.