# OCTOBER, 1935.

LIZZIE JANE MCMULLEN, RESPONDENT, v. MODERN WOODMEN OF AMERICA, APPELLANT.—87 S. W. (2d) 656.

Kansas City Court of Appeals.   October 7, 1935.

*William R. Ross, Horace Guffin* and *Randolph & Randolph* for respondent.

*George G. Perrin, George H. McDonald, Mayer, Conkling & Sprague, Nelson C. Pratt* and *Arthur N. Adams* for appellant.

CAMPBELL, C.—The defendant, a fraternal beneficiary society organized under the law of Illinois and duly licensed to transact business in Missouri, in April, 1898, issued to Robert G. McMullen, hereinafter called insured, a benefit certificate in the amount of $2000, in which plaintiff, wife of the insured, was the named beneficiary. The rate of assessment in the beginning on the certificate was eighty-five cents per month. In 1904 it was increased to $1.30; in 1919 it was increased to $2.40. The several increases were made

in accordance with the terms of the defendant's by-laws. The insured paid all assessments to and including the assessment due in October, 1929, but made no other or further payments. In June, 1929, the by-laws of the defendant were amended and the rate of assessment applicable to the insured was increased. The increase, however, was not effective until July, 1930. At the time of the increase in the rate of assessment last above mentioned the defendant provided for the issuance of a "new" form of insurance based on a level rate plan and further provided that any member of the society to whom a certificate was issued prior to July 1, 1919, could exchange his old certificate for a new one based upon the level rate plan. Following the adoption of this plan the defendant sent special representatives to interview its members who had certificates dated prior to July, 1919. By the terms of the by-laws the member whose certificate was issued prior to July 1, 1919, was not compelled to exchange his old certificate for a new one but if he retained his old certificate he was required to pay an increased rate of assessment. The defendant's special representatives were under duty to call upon each member to whom a new certificate could be issued, explain the new method and endeavor to induce an exchange of certificates.

The insured, McMullen, died March 25, 1933. The defendant was informed of his death, denied liability and thereupon plaintiff brought this suit based upon the certificate issued in 1898, and obtained a judgment, from which the defendant has appealed.

The defendant in the first count of its answer alleged that it did not have an office or agent in Buchanan County; that the cause of action stated in the petition did not accrue in that county, and therefore the trial court did not have jurisdiction of its person, and prayed that the cause be dismissed.

The defendant on appeal argues that the court erred in refusing to sustain its plea in abatement.

The defendant did not, in the trial of the cause, request the court to abate the action. On the contrary, the defendant at the close of plaintiff's evidence in the trial on the merits of the action requested the court to direct a verdict in its favor, and again at the close of all the evidence asked a like instruction.

Obviously the defendant was not entitled to a verdict in its favor on the merit of the action unless the court had jurisdiction of its person. The issue presented in the plea of abatement is not reviewable on appeal for the reason that it was not presented to nor passed upon by the trial court. [Spotts v. Spotts, 55 S. W. (2d) 977, 331 Mo. 917.]

The main contention of the defendant is that plaintiff failed to make a submissible case.

The parties agree that the insured did not pay or tender any

assessment after October, 1929, and that such failure *under the terms of the certificate* forfeited the insurance. The plaintiff contends that the acts and statements of the defendant's special representatives who. called on insured in November, 1929, were such that defendant is estopped to claim that insured's certificate was forfeited for the nonpayment of assessments.

The evidence relied upon to show estoppel is that of the plaintiff, who testified as follows:

"Q. Now Mrs. McMullen, after those men exhibited that letter to your husband and it was passed to you and read by you, I wish you would tell this jury in your own way what those men said to your husband about his insurance and what he said to them? A. They said his old policy was no good any more, he needn't pay any more dues on it; that he would have to take out a new policy. Of course, my husband was very angry; didn't talk very much about it. They told him it was no use him sending in any more dues, and we didn't get any more notices.

"Q. When they told him the policy was no good, that he would have to exchange it, what did your husband say to those men? A. He said he had had his old policy for so long and thought it still ought to be good and he was willing to pay the rates, whatever they asked, on the old policy, and didn't care about changing for a new one.

"Q. What did they say then? A. They said his old policy was of no value; needn't send any more dues. . . .

"Q. Did they ever tell him he had a right to pay and continue the old policy in force? A. No. They told him it was of no value and he needn't pay any more dues.

"Q. Told him it had to be exchanged? A. Had to be exchanged for a new policy.

"Q. After those men were there what did Mr. McMullen do about his insurance? A. About his policy?

"Q. Yes? A. He didn't do nothing.

"Q. Did he refuse to exchange with them? A. He said he couldn't go under another examination.

"Q. Did he refuse to trade policies with them? A. Yes, sir; he wanted to keep up his old policy at whatever rates they put the old policy at.

"Q. Was anything said to Mr. McMullen by those men, or by Mr. McMullen to those men about what the company was doing, or what effect it had on him? A. He got angry; told them they were not doing him right.

"Q. Is that all? A. He was angry with the way they were doing him after being in it so many years.

"Q. Did he tell them 'You are not doing me right?' A. Yes, said 'It's just like kicking me out.'

"Q. 'Just like kicking me out?' A. Yes, sir.

"Q. Did they arrive at any agreement or come to any conclusion? A. No, sir.

"Q. Did Mr. McMullen continue to hold his old certificate? A. Yes, sir.

"Q. What did he do after that about paying dues or assessments? A. They never sent any more notices; we considered they wouldn't take any more dues, just as the men said. . . .

"Q. The thing he (insured) objected to was the policy and not the amount to be paid? A. He didn't want to exchange the old for the new policy.

"Q. Said he would pay, no matter how much it was raised if he was protected? A. He paid before when it was raised, the policy.

"Q. You knew where Mr. Killiger, the clerk, was, didn't you? A. Yes, sir.

"Q. You knew this camp owned its own building there? A. Yes, sir, we got assessed for it.

"Q. And they kept the office there all the time? A. Yes, sir.

"Q. And did you ask Mr. Killiger anything about it? A. No, sir.

"Q. Never said a word to him about it? A. We took it for granted—

"Q. I am asking— A. That the men that came out—

"MR. ADAMS: I am just asking if she asked Mr. Killiger about it.

"MR. RANDOLPH: We think the explanation is proper. We ask that the witness be permitted to answer.

"THE COURT: Let her answer.

"A. We took it for granted when those men came and that letter that they were authorized and telling us the truth, that they would accept no more money on the old policy.

"Q. You had been paying dues, your husband had, for many, many years to Mr. Killiger? A. Yes, sir.

"Q. And you tell the jury you stopped right there— A. Because the men told us the old policy was of no value and they would receive no more dues on the old policy.

"Q. Did they say in the future they would receive no more dues and assessments? A. Yes, sir, they said they would receive none, have to take out a new policy at a new rate.

"Q. He said this contract you have there is no good? A. Yes, sir.

"Q. And that the Woodmen wouldn't receive any more dues and assessments? A. On the old policy. . . .

"Q. You say you got the little slips from Mr. Killiger right along? A. Yes, sir.

"Q. Did you get from the head office, a letter notifying him that he had been suspended? A. No, sir.

"Q. Something like this letter? (Exhibiting letter to witness.) A. No, sir, never seen one.

"Q. You haven't looked at it? A. I know that didn't come in the mail.

"Q. None at all? A. No, sir.

"Q. He didn't get any mail at all after those men were there? A. No notice of dues or anything else.

"Q. Never made any inquiry? A. No, sir.

"Q. Never went to the clerk, or offered to pay—that is, your husband didn't? A. No.

"Q. Nor did you go for him? A. No, sir; thought the men were sent from the head camp.

"Q. And that was all there was about it? A. Yes. . . .

"Q. Now your husband lived for forty-one months after he quit paying? A. Yes, sir.

"Q. And you tell the jury now he never went to the local camp and offered to pay? A. No, sir.

"Q. Or tendered any dues? A. Not after those men—

"Q. After those men were there? A. No, sir.

"Q. And never made any effort to be recognized as a member of the order? A. No, sir.

"Q. Just didn't do anything from that time on? A. No, sir.

. . .

"Q. I forgot to ask you about the Modern Woodmen Magazine. Your husband got the magazine right along? A. Yes, sir—he didn't get it in November; got it up to November.

"Q. Do you remember getting it during the time you told the jury you looked at it—each month it would come in to this address? A. Yes; I don't think I read every one, but it came.

"Q. It was there and your husband had it if he wanted it? A. Yes, we got it up until November."

The sum of the quoted evidence is that the defendant's representatives told the insured that his old certificate had no value; that the defendant would not accept any further assessment on it; that insured said that he had had the old certificate a long time and that he "thought it still ought to be good and he was willing to pay the rates, whatever they ask on the old policy, and didn't care about changing for a new one;" that the insured did not inquire of the local camp clerk, the person designated to receive assessments, concerning the matter; nor did the insured make any effort to ascertain whether or not the said representatives told him the truth.

The evidence in this case, legally speaking, is the same as the evidence in the case of Biggs v. Modern Woodmen of America, 82 S. W. (2d) 898.

In the Biggs case the Supreme Court based its holding that the plaintiff failed to prove estoppel upon the following grounds: That

Biggs did not believe the statement of the defendant's representatives; that Biggs knew that there was a change in the by-laws of the society which affected his rights, and though possessed of such knowledge, made no effort to ascertain the truth about the matter when in fact the means of information were available to him; and that the representations related to "the future and not the present status of his certificate."

In the instant case the plaintiff's evidence shows that insured told the defendant's representatives that he intended to keep his old certificate; that he thought it "ought to be good;" that he was willing to pay "at whatever rates they put the old policy at;" that he made no investigation nor did he exercise any diligence whatever to ascertain the actual status of his certificate. These facts under the holding in the Biggs case compel us to hold that plaintiff failed to prove estoppel.

The opinion in the Biggs case overruled the case of Bellis v. Modern Woodmen of America, 49 S. W. (2d) 1059. In the Bellis case the only assignment of error developed on the appeal was that there was no evidence upon which to base one of the paragraphs in plaintiff's main instruction. The paragraph which was criticised followed the plaintiff's evidence. We held that the instruction was not erroneous for the reasons assigned. In overruling the Bellis case, the Supreme Court must have held that the evidence was insufficient to show estoppel. The evidence in that case was strikingly similar to the evidence in the present case. Hence the ruling in the Biggs case controls the determination of the instant suit.

There is another reason supporting the holding that plaintiff failed to make a case for the jury. In the defendant's answer is the following:

"... that the defendant society endeavored to have special representatives call on all of the members who joined the society prior to July 1, A. D. 1919, to explain their rights, privileges, and options, and the authority of the said representatives was limited to the explanation of the various plans adopted by the society at its head camp in June, A. D. 1929, and the application of said plans to the individual member, explaining the advantages of exchanging from current cost to the level rate whole life plan, and where the member so desired, to accept applications for new insurance."

The plaintiff, in her reply, said:

"... admits that defendant endeavored to have and did have special representatives of the association call on all members who joined the association prior to July 1, 1919, for the purpose of explaining their rights, privileges and options under the by-laws enacted June, 1929, and admits that the authority of said representatives was limited to said explanation and, where the member so desired, to accept applications for new insurance."

206

The allegation that the authority of the defendant's representatives was "limited" to explaining the rights and privileges of the members of the society under the by-laws adopted in June, 1929, was a judicial admission that said representatives did not have authority to make the representations attributed to them, from which it follows that said representations were without force or effect.

We will not remand the cause for the reason that under the ruling in the Biggs case, supra, the evidence considered in a light most favorable to plaintiff shows that she was not entitled to recover. The judgment is reversed. *Reynolds, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is reversed. All concur.